IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

LARRY GRIZZELL, As Independent )
Administrator of the Estate of David )
Grizzell, Deceased, )
                                                           )
               Plaintiff, )
                                                             )
vs. ) CIVIL NO. 07-414-GPM
                                                           )
UNITED STATES OF AMERICA, )
                                                           )
               Defendant. )

## MEMORANDUM AND ORDER

**MURPHY, District Judge:**

This matter came before the Court for bench trial on August 18, 2008. A short time later the Plaintiff, David Grizzell, died. His son was appointed as the administrator of Mr. Grizzell's estate and was substituted as Plaintiff in this case. Pursuant to Federal Rule of Civil Procedure 52, the Court issues the following findings and conclusions.

### FACTUAL BACKGROUND

On September 18, 2004, David Grizzell, a 75-year-old Air Force veteran, fell off of a step stool while changing a light bulb.[1] He was treated at the VA Hospital in St. Louis, Missouri, for a serious fracture to his left knee. Dr. Gary Miller operated on Grizzell on September 20, 2004, and affixed an external fixation device for the Schatzker type VI tibial plateau fracture. On September 23rd, Grizzell was transferred to Benton Healthcare Center, a skilled nursing facility in Benton,

---

[1] There are some references in the record to Grizzell being 74 years old on September 18th; however, his date of birth is January 10, 1929.

Illinois. Ten days later, Grizzell returned to the VA for a scheduled follow-up appointment. His leg was grossly infected. He stayed at the VA from October 4th thru January 29, 2005. After two surgical debridements, his left leg required amputatation and then another surgical debridment. Being unable to care for himself, he lived out his life in a nursing home in Marion, Iowa.

Dr. Miller expertly performed the required surgery. But the care Grizzell received at the Benton Healthcare Center was as poor as Dr. Miller's surgery was good. The issue is whether adequate post-operative care instructions were given by the VA to Grizzell. Specifically, Plaintiff claims that had Grizzell been informed, he would have been in a position to prevent or mitigate the damage caused by the infection.

In this Federal Tort Claims Act (FTCA) suit, Plaintiff claims that the VA was negligent in failing to properly instruct his decedent about wound care and that this negligence was a proximate cause of the damages he seeks.

## ANALYSIS

The FTCA provides, in pertinent part: "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. "The FTCA was designed primarily to remove the sovereign immunity of the United States from suits in tort and, with certain specific exceptions, to render the Government liable in tort as a private individual would be under like circumstances." *Campbell v. United States*, 904 F.2d 1188, 1191 (7th Cir. 1990) (internal quotation omitted). "A case brought under the FTCA is governed by 'the law of the place where the act or omission occurred.'" *Id.*, *quoting* 28 U.S.C. § 1346(b). Accordingly, this medical malpractice action is controlled by the law of the state of Missouri. Under Missouri law, the burden is on the

plaintiff in a medical malpractice action to prove: (1) an act or omission of the defendant failed to meet the requisite medical standard of care; (2) the act or omission was performed negligently; and (3) the act or omission caused the plaintiff's injury. *See Sundermeyer v. SSM Regional Health Svcs.*, 271 S.W.3d 552, 554 (Mo. 2008).

Standard of Care

Defendant argues there is no standard of care for pin site management; therefore, Plaintiff cannot show a breach of that standard. This is not so. Everyone knows and agrees that any surgical wound, particularly a pin site, must be kept clean. True enough there are different acceptable means to accomplish this, but cleanliness is required. But this case is not about how to keep pin sites clean. The question is whether the standard of care requires that a patient be given sufficient post-operative instructions to defend himself against later inadequate care. Plaintiff argues that Defendant breached the standard of care by failing to instruct Grizzell that the pin sites must be kept clean to prevent infection; that the pin sites must be cleaned daily to prevent infection; and about the signs of infection for which he should be watching.

"Medical negligence … is 'the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of defendant's profession.'" *Hickman v. Branson Ear, Nose & Throat, Inc.*, 256 S.W.3d 120, 122 (Mo. 2008), *quoting* MAI 11.06. As a general rule, expert testimony is needed to explain what is the standard of care and how the defendant violated that standard. *Id*. at 123; *Yoos v. Jewish Hosp. of St. Louis*, 645 S.W.2d 177, 183 (Mo. Ct. App. 1982) (in Missouri, "what is or is not standard practice must be established by expert medical testimony … because the ordinary layman is not equipped by common knowledge and experience to judge the skill and competence of the practice at issue and determine whether it squares with the

standard of such professional practice in the community"). Independent expert medical testimony is not required where "the defendant-doctor's own testimony establishes the standard of care." *Baker v. Gordon*, 759 S.W.2d 87, 91-92 (Mo. Ct. App. 1988). "'[W]here the conduct in question does not involve skill or technique in an area where knowledge of such is a peculiar possession of the profession and does involve a matter which any layman (or court) could know, then such 'professional' testimony is not necessary.'" *Howard v. Research Hosp. and Med. Ctr.*, 563 S.W.2d 111, 112-13 (Mo. Ct. App. 1978), *quoting Steele v. Woods*, 327 S.W.2d 187, 198 (Mo. 1959).[2]

Dr. Miller's trial testimony started badly for the defense and then got worse. He disagreed that "standard of care" means "what a reasonably prudent health care provider would do under the same or similar circumstances" (Doc. 80 at 28-29). He then intimated that there are multiple standards because "[t]here is certainly more than one way to skin a cat" (*Id*. at 29). Throughout his testimony, he tried to "correct" what he had said in his deposition by repeatedly stating that what he said in his deposition was not true or that he had expressed himself badly.

> At its best, the questioning of an expert witness on the elements of a negligence case is akin to the performance of a beautiful song. The law provides the "lyrics" – standard of care, its breach, and causation – and the individual lawyer's nuance of expression and organization provide the "music." An effective performance needs not just great music, but the right lyrics.

*Hickman*, 256 S.W.3d at 122.

It is easy enough to infer from the evidence, as this Court found during Dr. Miller's testimony at trial, that the pin sites should be kept clean. There may not be a specific protocol – some providers

---

[2]Cases that apply this "common sense" rule, including *Howard*, go so far as to approve the jury instruction defining negligence and ordinary care, MAI 11.07, rather than that defining professional negligence, MAI 11.06. *See, e.g., Robbins v. Jewish Hosp. of St. Louis*, 663 S.W.2d 341, 346-47 (Mo. Ct. App. 1983).

may prefer soapy water over peroxide or cotton squab over gauze, but all can agree that pin sites must be kept clean to prevent infection. In the end, Dr. Miller agreed that "the standard of care is to keep the pins clean" (Doc. 80 at 251). In his deposition, which was admitted for the admissions it contains and not just for impeachment, Dr. Miller testified that "as a reasonably prudent physician," he would give patients such as Grizzell oral instructions in addition to his written discharge instruction explaining pin site care – specifically, the need to cleanse the pins at least once a day using a Q-tip soaked in saline or hydrogen peroxide; that application of a dressing is arbitrary; and cautioning the patient to notify the VA of any signs of infection (Ex. 21 at 49-52). He testified at trial that his physician assistant at the VA, Rosemary Alexander-Ledbetter, was also responsible for cleaning the pins and educating patients on pin site care (Doc. 80 at 219). She testified, by deposition, that the standard of care required that Grizzell be "fully informed, instructed, and educated as it would relate to cleaning the pins, the method, the manner, the frequency, as well as the importance, and also be instructed as it would relate to changing his dressing" (Alexander-Ledbetter Dep. at 12-13). The standard required that Grizzell be fully informed so he would know if "the standard was being done at the nursing home" (*Id*. at 13). The standard requires Grizzell to understand all that the standard of care required so that he could call the VA if he was not receiving the requisite care (*Id*. at 13-14). Defendant's own retained expert, Dr. Steven Graboff, testified that the standard of care is to keep the surgical site clean and while physicians differ on the manner in which it is done, all methods "revolve around the general principle of cleanliness" (Doc. 81 at 26-28).

      So Plaintiff sufficiently established the standard of care for pins and pin sites and for

instructing the patient on that standard.[3]

Breach

With respect to post-operative instructions, Dr. Miller's testimony that he gave instructions to Grizzell every day is not credible. It does not appear from the medical records that Dr. Miller saw Grizzell every day, despite his testimony to the contrary. And Dr. Miller's testimony that he would not document in the record every time he saw a patient is likewise not credible. Dr. Miller testified that it was his custom and practice to see such a patient every evening, to clean the patient's pins every day, and, while cleaning the pins, to show and instruct the patient how to care for the pins. He also testified that he had a specific, independent recollection of cleaning Grizzell's pins and showing and instructing Grizzell on pin care, but if this happened it was never charted. This testimony is not credible because Dr. Miller was otherwise particular about charting, as was the rest of the VA staff.

P.A. Alexander-Ledbetter testified she cleaned Grizzell's pins every day between September 20th and 23rd and that she remembered talking to him about the care and cleaning of the pins (Alexander-Ledbetter Dep. at 29).[4] She even testified that she remembers Grizzell asking her if she counts how many times the Q-tip goes around the wire and that she answered "No, as long as it's clean and I've cleaned each wire completely, I don't actually count how many times" (*Id.* at 9). But

---

[3]Notably, a New York court has specifically held that the plaintiff's expert's testimony that the accepted standard of care for patients with external fixator pins was to "instruct them, upon discharge, to clean the pin site wounds daily with either peroxide or soapy water," and that the orthopedic surgeon's instructions "not to touch the pins at all represented an unacceptable practice and a departure from the applicable standard of care" was sufficient evidence to make out a prima facie case that the doctor deviated from the applicable standard of care. *Johnson v. Jamaica Hosp. Med. Ctr.*, 800 N.Y.2d 609, 610-11 (N.Y. App. Div. 2005).

[4]Because Rosemary Alexander-Ledbetter has a Ph. D. in medicine, she was referred to in her deposition and during trial as Dr. Ledbetter; she is not, however, an M.D.

when asked the context of that story, she explained that Grizzell was "just making conversation" when she was doing pin care (*Id.* at 29-30). None of this – her care or patient instruction – is reflected in the medical records. The chart does show that she saw Grizzell every day from the 20th to the 23rd.

The discharge instructions cut against Defendant. Dr. Ledbetter completed the instructions and inscribed that a copy was given to Grizzell (Ex. 3 at 6-8). However, an addendum to the nursing notes reflects that Grizzell was medicated with Vicodin before discharge and that the paperwork was given to one of the paramedics transporting him. Dr. Ledbetter was not aware whether the discharge instruction sheet was ever handed to Grizzell (Alexander-Ledbetter Dep. at 11-12). The only written instruction regarding maintenance of the pin sites falls under the "Wound Management" listing on the discharge instruction sheet and states: "Clean the pins with saline." (Ex. 3 at 7). Dr. Ledbetter acknowledged that the discharge instructions did not specify that the pin sites needed to be cleaned daily nor did they specify anything regarding dressing change (Alexander-Ledbetter Dep. at 22-23). Dr. Steven Magilen, Plaintiff's retained expert, criticized the discharge instructions in the first instance.[5] He opined that Dr. Miller deviated from the standard of care in failing to give appropriate wound care orders and follow-up and that the VA deviated from the standard of care in failing to provide adequate discharge orders and follow-up instructions (Ex. 6).

But even assuming Dr. Miller and Dr. Ledbetter did everything they say they did, the evidence is clear that Grizzell could not hear and that the VA knew or should have known that he could not hear. The VA records contain a "Consult Request" completed by a physical therapist in December 2004 – after Grizzell returned to the VA. The Request describes Grizzell as being very

---

[5]Dr. Magilen is a general surgeon with a subspecialty interest in wound care.

hard of hearing, frequently saying "what" during questioning, and appearing to understand simple commands once he hears them (Ex. 2B). Grizzell was diagnosed with hearing loss and was given a Pocket Talker to increase his ability to hear instructions from staff (*Id*.). The Court rejects Defendant's argument that Grizzell, who had worked in the Air Force servicing planes as an aircraft radio mechanic (*see* Ex. 8; Doc. 80 at 175), lost his hearing sometime between October and December 2004. Most notably, the Progress Notes entered on September 18, 2004, during Grizzell's initial assessment list as a Nursing Intervention: "12. Ensure patient has glasses available within reach, hearing aids are worn and functioning correctly, assistive devices are within reach, and understands need to have nursing assist for transfers and ambulation." (Ex. 2A at Bates 1237). These facts make whatever oral instructions *may* have been given insufficient. *Cf. Shelton v. United States*, 804 F. Supp. 1147, 1159 (E.D. Mo. 1992) (finding discharge instructions sufficient where nurse wrote additional instructions reiterating her verbal instructions on separate discharge papers for plaintiff because she believed he had been inattentive during her earlier explanation of wound care and no evidence showed that plaintiff did not understand discharge instructions or that he was unable to understand instructions due to mental incapacity).

Regrettably, when Grizzell was deposed shortly before trial, his mental status was such that he was unable to give reliable testimony on whether anyone at the VA instructed him on caring for his pin sites (*see* David Grizzell Dep. Transcript and Video). So the Court is left to infer, from all the other evidence, the likehood that he was given meaningful instructions. The defense's focus on the fact that Grizzell went to a skilled nursing facility that should have provided the care he needed weighs in favor of Plaintiff's contention that Grizzell was not properly instructed (*see* Doc. 80 at 49-50).

It is clear from Exhibits 16 and 17 that written materials regarding pin site care were easily accessible in 2004. Dr. Miller acknowledged as much. In fact, he said that he easily could have written his own instructions. But he did not do so, and the consequences of that failure are substantial.

Causation

A plaintiff must establish a causal connection between the negligence alleged and the loss or injury sustained. *Robbins v. Jewish Hosp. of St. Louis*, 663 S.W.2d 341, 344-45 (Mo. Ct. App. 1983). The usual test is "whether the facts in evidence show that the injuries would not have been sustained in the absence of such negligence." *Id*. at 345. This has been referred to as "but for" causation. "'But for' is the minimum causation because it merely proves that defendant's conduct is causally connected to the plaintiff's injury." *Harvey v. Washington*, 95 S.W.3d 93, 96 (Mo. 2003). "'Two causes that combine' can constitute 'but for' causation." *Id*. "The general rule is that if a defendant is negligent and his [or her] negligence combines with that of another, or with any other independent, intervening cause, he [or she] is liable, although his [or her] negligence was not the sole negligence or the sole proximate cause, and although his [or her] negligence, without such other independent, intervening cause, would not have produced the injury." *Id*., *quoting Calson v. K-Mart Corp.*, 979 S.W.2d 145, 147 (Mo. 1998). In addition to factual, or "but for," causation, legal causation requires a direct connection. *Sundermeyer*, 271 S.W.3d at 555. But in the end, a causation analysis must not "lose sight" of the ultimate issue: "All of this discussion concerning the semantics of causation is less important in Missouri than in most jurisdictions because under MAI we do not use the terms 1) 'proximate cause,' 2) 'but for causation,' or 3) 'substantial factor' when instructing the jury. We merely instruct the jury that the defendant's conduct must 'directly cause' or 'directly contribute to

cause' plaintiff's injury." *Id*.

Under this standard, the causation element is met. David Grizzell developed a pin site infection; the infection was difficult to treat; the infection declared itself with acute osteomyelitis; further surgical treatment of the acute osteomyelitis would have been taxing on Grizzell; and so he opted for amputation (*see* Doc. 80 at 112). Dr. Miller testified that the most likely explanation for the infection was poor pin care and dressing care (*Id*. at 115).[6] He also testified that "the failure to clean the pins lead to the infection of the pins, and the infection of the pins lead to the osteomyelitis" (*Id*. at 240). Defendant's expert, Dr. Graboff, testified that he would not disagree with Dr. Miller's testimony on the issue (Doc. 81 at 83-84). There is no question that the VA's conduct in failing to properly instruct Grizzell on pin site care directly contributed to cause Grizzell's injury. The record is replete with evidence that before his injury, Grizzell was an active, highly intelligent, cooperative, and well-motivated man, and there is no question that he would have followed adequate instructions had they been given. Defendant's retained expert, like all others, agreed that with proper care, this infection and ultimate loss of Grizzell's leg would not have happened.

Damages

Missouri law allows the following categories of damages in actions against health care providers: past economic damages, including past medical damages; past non-economic damages; future medical damages; future economic damages excluding future medical damages; and future non-economic damages. MAI 21.03; MAI 21.05; MAI 36.20. "Non-economic damages" are defined as "damages arising from nonpecuniary harm, including, without limitation, pain, suffering, mental

---

[6]This testimony takes this case outside the realm of a "lost chance of recovery" case, by which many loss of limb cases are analyzed. *See Wollen v. DePaul Health Ctr.*, 828 S.W.2d 681 (Mo. 1992).

anguish, inconvenience, physical impairment, disfigurement, loss of capacity to enjoy life, and loss of consortium but shall not include punitive damages." RSMo. § 538.205.7. In cases filed after August 28, 2005, a plaintiff many not recover more than $350,000 for non-economic damages. *Id*. at §§ 538.210, 538.305.

The Court must consider what effect Grizzell's death has on any of the elements of damages claimed at trial. Under Missouri law, Grizzell's claim is not extinguished.[7]

> Causes of action for personal injuries, other than those resulting in death, whether such injuries be to the health or to the person of the injured party, shall not abate by reason of his death, nor by reason of the death of the person against whom such cause of action shall have accrued; but in case of the death of either or both such parties, such cause of action shall survive to the personal representative of such injured party, and against the person, receiver or corporation liable for such injuries and his legal representatives, and the liability and the measure of damages shall be the same as if such death or deaths had not occurred. Causes of action for death shall not abate by reason of the death of any party to any such cause of action, but shall survive to the personal representative of such party bringing such cause of action and against the person, receiver or corporation liable for such death and his or its legal representatives.

RSMo. § 537.020.1. Pain and suffering can occur only between the date of injury and date of death. *Harris v. Goggins*, 374 S.W.2d 6, 16 (Mo. 1963). All recoverable damages are confined to those that Grizzell suffered up to the time of his death. *See Adelsberger v. Sheehy*, 79 S.W.2d 109, 114 (Mo. 1934). In other words, Plaintiff is entitled to recover only such damages as accrued before Grizzell's death and which he could have recovered had he survived, including damages for physical and mental pain and suffering; loss of wages, if any, from the accident until his death; and medical and hospital expenses resulting from the injuries sustained in the accident. *Id*. Because Grizzell died only 10 days after the trial concluded, the Court will not consider the life expectancy of 8.6 years submitted at trial

---

[7]Federal Rule of Civil Procedure 25 governs the substitution of parties where the claim is not extinguished. Plaintiff complied with the procedure set forth in that rule.

(*see* Ex. 9) in calculating damages. *See Adelsberger*, 79 S.W.2d at 114 (loss of earnings for the period that the deceased would have lived, had he lived out his life expectancy, cannot be considered); *cf.* RSMo. § 538.220.5 (payment of future medical damages continues to the estate of the judgment creditor only for as long as necessary to enable the estate to satisfy medical expenses that were due and owing at the time of the judgment creditor's death).

Grizzell lived independently until the day he fractured his left leg (*see* Ex. 8). He owned his car and rented his house. He did his own grocery shopping and drove his older sister on errands. (*See* Doc. 80 at 178-79). Grizzell was repeatedly described as a sharp and intelligent person (*see, e.g.,* Alexander-Ledbetter Dep. at 31-32). Dr. Graboff's summary of the case is sobering:

> [Grizzell] had a pin-site infection. He had a raging soft tissue infection in the area of the prior external fixation device, and he underwent a number of operative procedures to try and take care of this, including irrigation and debridement procedures, the installation of antibiotic-impregnated beads – which is a standard orthopedic technique to try to deal with deep infections such as this, acutely. But his general medical condition continued to worsen, and he developed renal failure and was now developing, not only a limb-threatening condition, but a life-threatening condition, and therefore he underwent a knee amputation to save his life. And that procedure required one additional irrigation and debridement for the stump on the 29th of November 2004.
> So in just a brief summary of his case, then, he was admitted with a closed fracture, he underwent a standard orthopedic surgical fixation for the fracture. He was transferred to a nursing care facility for a short period of time, but returned to the VA hospital with an infection. His medical condition deteriorated and an amputation was performed successfully.

(Doc. 81 at 12-13). After he lost his leg, Grizzell needed to live in an intermediate care facility requiring 24 hour nursing supervision (Richardson Dep. at 8-9).[8] He was unable to get himself dressed, wash his face, use the restroom, or bathe without assistance (*Id.*). He was unable to use the

---

[8]Robert Richardson is the Administrator at Winslow House Care Center in Marion, Iowa, where Grizzell lived from January 2005 until his death.

restroom that he shared with his roommate because it was not wheelchair accessible. So each time he needed to use the toilet or take a bath (because he could not stand to shower), nursing aids used an electric lifting machine to lift him out of his chair or bed and wheel him down the hall – all the while hanging from the lift – to the bathroom (Doc. 80 at 180-81).[9] He shared a 30 by 24 foot room (Richardson Dep. at 6-7). Grizzell could not hear his television, and his roommates complained about how loud it was. He was physically unable to attend his sister's funeral. Grizzell's pain, suffering, mental anguish, inconvenience, physical impairment, disfigurement, and loss of capacity to enjoy life easily exceeds the $350,000 cap.

Grizzell was retired from his maintenance job at the First Christian Church but remained active in the church. He does not have any lost wages, but he did lose his ability to contribute to the church doing volunteer work. (*See* Doc. 80 at 178-79). His economic damages are limited to the cost of living at Winslow House Care Center for 3.58 years, totaling $158,399. (*See* Richardson Dep. at 9-10). The costs of Cottage Grove Place, where Grizzell's son and daughter-in-law hoped to move him, and for a wheelchair accessible van are not compensable in light of Grizzell's death.

The Court awards Plaintiff damages in the total amount of $508,399.

CONCLUSION

Infection is a risk attendant to applying an external fixation device – Defendant's own expert so testified. But that is not the defense pitched to the Court. Rather than argue everyone, including the nursing facility, acted properly, Dr. Miller, presented a credibility battle about what instructions were given to Mr. Grizzell that is not supported by the evidence taken as a whole. So while he

---

[9]During his extended hospitalization at the VA, Grizzell's right foot became what is described in the record as a "drop foot," whereby he could not stand to pivot on his right foot. Therefore, he had to be mechanically lifted from his chair or bed.

proved he is a skilled surgeon, Dr. Miller's testimony is not credible and the Court finds in favor of Plaintiff and against Defendant and directs the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**

DATED: 03/24/09

s/ *G. Patrick Murphy*
G. PATRICK MURPHY
United States District Judge